# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ROBERT G. HICKS ET AL.**                                              CIVIL ACTION

**VERSUS**                                                                      No. 17-2275

**BP EXPLORATION & PRODUCTION,**
**INC. ET AL.**                                                                    SECTION I

## ORDER AND REASONS

The question is, what substantive law governs plaintiffs' case? BP Exploration and Production Inc. ("BP Exploration"), BP America Production Company ("BP America") (collectively, "the BP defendants"), and Bishop Lifting Products, Inc. ("Bishop") argue that Louisiana law applies to this negligence action, at least as to plaintiffs' tort claims against them.[1] Plaintiffs counter that general maritime law, not Louisiana law, applies.

Before the Court are three motions[2] for summary judgment on this narrow, yet significant, issue.

## I.

The MAD DOG is an oil and gas spar platform located on the Outer Continental Shelf ("OCS") in the Gulf of Mexico that is owned and operated by BP

---

[1] This opinion does not speak to BP Exploration's potential liability as a time charterer. Thus, the phrase "plaintiffs' tort claims," as used in this opinion, does not encompass any negligence claim that may be brought against BP Exploration in its capacity as time charterer of the OCSV SIEM STINGRAY.

Further, this opinion does not address what law governs plaintiffs' claims against Subsea 7 US LLC and Siem Offshore Rederis AS.

[2] R. Doc. No. 57; R. Doc. No. 58; R. Doc. No. 59.

Exploration.[3]   In March 2016, a vessel—the OCSV SIEM STINGRAY ("STINGRAY")—was being used as a "flotel," or living quarters, for at least some of the MAD DOG's crew and subcontractors.[4]  At the time, BP Exploration was the time charterer of the STINGRAY.

While BP America employs many of the personnel on the MAD DOG, it does not employ them all.  For example, Bishop had at least one employee stationed on the MAD DOG in March 2016.   Ensco PLC Drilling ("Ensco") also had employees stationed on the MAD DOG, including Robert Hicks ("Hicks").

In March 2016, Hicks was working as a rig electrician on the MAD DOG pursuant to a contract between Ensco and BP Exploration.  He was "rooming" on the STINGRAY at the time,[5] and would be transferred to and from the MAD DOG via a personnel basket.  The crane facilitating the transfers was located on the MAD DOG.

Hicks alleges that, on March 20, 2016, he was injured during one of these transfers.   According to Hicks, the personnel basket in which he was being transferred "hit the deck of the [STINGRAY]," then "jerked up" before it "hit the [STINGRAY] again."[6]  Hicks contends that he "fell down in the basket" the second time that it made contact with the STINGRAY, with "one leg in [the basket] and one leg out of it."[7]

---

[3] The Court looks to the description of the MAD DOG offered by Judge Costa in *Riley v. Alexander/Ryan Marine Services Co.*, 983 F. Supp. 2d 884, 886 (S.D. Tex. 2013).
[4] Plaintiffs allege that the STINGRAY was moored to the MAD DOG at the time of the incident.  *See* R. Doc. No. 1, ¶ 18.
[5] R. Doc. No. 59-5, at 38.
[6] *Id.* at 27-28.
[7] *Id.* at 30, 38.

Hicks and his wife eventually initiated this tort action. They allege that negligence attributable to BP Exploration, BP America, and Bishop—as well as other defendants—during the March 20, 2016 personnel basket transfer from the MAD DOG to the STINGRAY caused the injuries about which Hicks now complains.

## II.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its initial burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue of material fact is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* However, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

Moreover, "[a]lthough the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (quoting 11 Moore's Federal Practice–Civil ¶ 56.91 (2017)). "This flexibility allows the court to consider the evidence that would likely be admitted at trial . . . without imposing on parties the time and expense it takes to authenticate everything in the record." *Maurer v. Independence Town*, No. 16-30673, 2017 WL 3866561, at *3 (5th Cir. Sept. 5, 2017).

## III.

### A.

The Court must first consider whether this tort action arises under the Outer Continental Shelf Lands Act ("OCSLA"). The statute's jurisdictional grant provides, in relevant part, that

> the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with [ ] any operation conducted on the outer Continental Shelf which involves exploration,

development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals.

43 U.S.C. § 1349(b)(1). "The Fifth Circuit has interpreted this language as straightforward and broad," *In re DEEPWATER HORIZON*, 745 F.3d 157, 163 (5th Cir. 2014), applying a "but-for" test to define its scope, *see Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 350 (5th Cir. 1999) ("We apply a broad 'but-for' test to determine whether a cause of action arises under OCSLA."); *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988) ("We have established a 'but for' test to resolve" the question whether § 1349(b)(1) is satisfied in a given case.). This "but-for" test consists of three elements: "(1) the facts underlying the complaint occurred on the proper situs; (2) the plaintiff's employment furthered mineral development on the OCS; and (3) the plaintiff's injury would not have occurred but for his employment."[8]

---

[8] In a precedential opinion published the year after *Barker*, a panel of the Fifth Circuit appeared to call into question the first element of *Barker*'s articulation of the "but-for" test, stating that, "[b]ecause federal jurisdiction exists for cases 'arising out of, or in connection with' OCS operations, [OCSLA] precludes an artificial limit based on situs and [such a] formulation conflicts with this court's but-for test." *In re DEEPWATER HORIZON*, 745 F.3d at 164 (quoting 43 U.S.C. § 1349(b)(1)) (internal citation omitted). The panel mentioned *Barker* only once, for the proposition that "[a] plaintiff does not need to expressly invoke OCSLA in order for it to apply." *Id.* (quoting *Barker*, 713 F.3d at 213) (alteration in original).

   The Court notes that *Barker*'s inclusion of a situs requirement in its articulation of the "but-for" test has support in Fifth Circuit precedent. *See, e.g.*, *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 784 (5th Cir. 2009) (en banc) ("Thus, in a tort action, *Rodrigue* [*v. Aetna Cas. & Sur. Co.*, 395 U.S. 352 (1969),] illustrates that the OCSLA situs requirement is met if the tort occurs on a platform or other OCSLA covered situs as provided in § 1333(a)(2)(A)."); *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990) ("But for adjacent state law to apply as surrogate federal law under OCSLA, three conditions are significant," the first of which is that "[t]he controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artific[i]al structures permanently or temporarily attached thereto).").

*Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013) (Clement, J., with whom Haynes, J., concurs).

The Fifth Circuit's application of this test in *Recar v. CNG Producing Co.*, 853 F.2d 367 (5th Cir. 1988), is particularly instructive. Thomas Recar "was employed by Land & Offshore Company as a maintenance crew foreman." *Recar*, 853 F.2d at 368. According to the Fifth Circuit,

> Recar and his crew had been engaged for some time in repairing and painting platforms that CNG Producing Company (CNG) owned on the Outer Continental Shelf off the coast of Louisiana in the Gulf of Mexico. CNG had hired the M/V GRADY FAGAN to transport the crew from platform to platform, and Recar and his crew ate and slept aboard this vessel. Additionally, Recar spent a large part of his work time aboard the GRADY FAGAN, monitoring the crew's work. On the morning of November 28, 1985, Recar alleges that he was swinging from a CNG platform to the GRADY FAGAN when the rope broke, causing Recar to fall to the deck of the GRADY FAGAN and injure his neck.

*Id.* The Fifth Circuit concluded that Recar's case fell within the scope of OCSLA. *Id.* at 369. It pointed out that "Recar, at the time of his injury[,] was working as the foreman of a maintenance crew engaged in painting and repairing production platforms which were built and maintained for the purpose of producing oil and gas from wells previously drilled." *Id.* Thus, the Fifth Circuit determined that "Recar's

---

The inclusion of a situs requirement as a component of the "but-for" test is also consistent with the Supreme Court's understanding of OCSLA. *See Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 219 (1986) ("We do not interpret § 4 of OCSLA to require or permit us to extend the coverage of the statute to the platform workers in this case who were killed miles away from the platform and on the high seas simply because they were platform workers. Congress determined that the general scope of OCSLA's coverage . . . would be determined principally by locale, not by the status of the individual injured or killed." (internal citation omitted)).

The Court will apply the "but-for" test as articulated in *Barker*, which includes a situs requirement.

work maintaining the production platform furthered mineral development" on the OCS and that "Recar would not have been injured 'but for' the maintenance work he was performing and supervising on the platform." *Id.*

Applying the "but-for" test to the undisputed facts, the Court concludes that OCSLA jurisdiction extends to plaintiffs' tort action. As a contract rig electrician on the MAD DOG—an oil and gas spar platform on the OCS[9]—Hicks' employment undoubtedly furthered mineral development on the OCS. *Cf. id.* In addition, Hicks would not have suffered his alleged injury but for his employment on the offshore platform. *Cf. Barker* 713 F.3d at 213 ("[I]t is clear that but for his employment, Barker would not have been involved in the incident forming the basis of this suit."); *Hufnagel*, 182 F.3d at 350 ("But for Hufnagel's work on the platform, his injury would not have occurred."); *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996) (concluding that the "but-for" test was satisfied and OCSLA jurisdiction existed where "[a]n ocean-going vessel . . . allided with a platform secured to the outer continental shelf some 35 miles off the coast of Louisiana," *id.* at 152, because "there would not have been an accident had Tennessee Gas not built its platform to extract minerals from the OCS," *id.* at 155).

Further, "[c]ourts have held that when . . . an individual is 'physically connected' to an offshore platform at the time of the accident giving rise to the suit, the OCSLA situs requirement is satisfied." *Landerman v. Tarpon Operating & Dev.,*

---

[9] The Court notes that, despite suggestive language to the contrary in their briefing, plaintiffs are not arguing that the MAD DOG qualifies as a "vessel" under general maritime law. *See* R. Doc. No. 85.

*L.L.C.*, 19 F. Supp. 3d 678, 683 (E.D. La. 2014) (Vance, J.) (citing cases).  At the time of his alleged injury, Hicks was at least partly in the personnel basket and, through the basket, he was physically connected to the MAD DOG.  *Cf. Henson v. Odyssea Vessels, Inc.*, No. 07-613, 2007 WL 3343011, at *1 (E.D. La. Nov. 8, 2007) (Barbier, J.) (treating OCSLA as covering an action involving a plaintiff who, "in an effort to return to shore, was lowered in a personnel basket via crane onto the deck of a crew boat," and, "[i]n the process of being lowered, . . . was 'violently slammed into the cluttered deck' of the waiting vessel"), *modified*, 2008 WL 544184 (E.D. La. Feb. 25, 2008) (Barbier, J.); *Champagne v. Tetra Applied Techs. Inc.*, No. 05-299, 2006 WL 287985, at *3 (S.D. Tex. Feb. 6, 2006) (concluding that an accident occurred on an OCSLA situs where the injured platform worker "was connected to the personnel basket at the time of the alleged injury and [ ] through the basket [ ] was physically connected to the crane and Exxon's platform").[10]  The MAD DOG is unquestionably a

---

[10] In reaching its conclusion that the accident occurred on an OCSLA situs, the *Champagne* Court relied on the Fifth Circuit's opinions in *Hollier v. Union Texas Petroleum Corp.*, 972 F.2d 662 (5th Cir. 1992) and *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512 (5th Cir. 1996).

Both *Hollier* and *Hodgen* involved disputes over contractual indemnity provisions.  As pertinent here, the Fifth Circuit in each case determined that the contractual controversy at issue occurred on an OCSLA situs and thus OCSLA applied.  In *Hollier*, the Fifth Circuit concluded that, because the plaintiff "was in physical contact with the platform at the time of his injury," the accident at the heart of the case occurred on an OCSLA situs.  972 F.2d at 664-65.  "Assuming without deciding that *Hollier* . . . state[s] a rule in this circuit providing that the situs of the controversy in an OCSLA indemnity clause case is the location of the accident," the Fifth Circuit in *Hodgen* likewise concluded that the OCSLA situs requirement was satisfied, because the plaintiff "was in physical contact with the rope, a portion of the platform, at the time of his unfortunate landing on the" vessel.  87 F.3d at 1527.

Both *Hollier* and *Hodgen* have since been overruled insofar as they determined that the situs of the controversy in *contract* cases is the location of the accident.  *See Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 781 (5th Cir. 2009)

covered situs under OCSLA. *See* 43 U.S.C. § 1333(a)(2)(A) (covering "artificial islands

and fixed structures erected" on the OCS); *see also Grand Isle Shipyard, Inc. v. Seacor*

*Marine, LLC*, 589 F.3d 778, 785 (5th Cir. 2009) (en banc) (observing that a stationary

platform on the OCS qualifies as an OCSLA situs).

The Court concludes that plaintiffs' tort action arises under OCSLA.[11]

### B.

"The purpose of [OCSLA] was to define a body of law applicable to the seabed,

the subsoil, and the fixed structures . . . on the [O]uter Continental Shelf." *Rodrigue*

*v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969). To this end, OCSLA provides, in

pertinent part:

> To the extent that they are applicable and not inconsistent with
> [Subchapter III of Title 43, United States Code, Chapter 29,] or with
> other Federal laws and regulations of the Secretary [of the Interior] now
> in effect or hereafter adopted, the civil and criminal laws of each
> adjacent State, now in effect or hereafter adopted, amended, or repealed
> are declared to be the law of the United States for that portion of the
> subsoil and seabed of the outer Continental Shelf, and artificial islands

---

(en banc) ("We hold that the focus-of-the-contract test is the appropriate test to apply in determining the situs of the controversy in contract cases, and we adopt that rule for the circuit."). Importantly, however, the rule applied in those two cases—and relied on by the *Champagne* Court—remains the applicable rule in *tort* cases, such as the present case. *See id.* at 784 ("Thus, in a tort action, *Rodrigue* illustrates that the OCSLA situs requirement is met if the tort occurs on a platform or other OCSLA covered situs as provided in § 1333(a)(2)(A)."); *see also Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prod. Co.*, 448 F.3d 760, 773 (5th Cir.), *amended on reh'g*, 453 F.3d 652 (5th Cir. 2006) ("[I]n this Circuit, *Rodrigue* is not limited to harm occurring on the fixed platform itself.").

[11] Both BP and Bishop contend that this case arises under OCSLA. *See* R. Doc. No. 57-1, at 6; R. Doc. No. 58-1, at 5. Plaintiffs do not contest this argument. *See* R. Doc. No. 59-1; R. Doc. No. 64. As such, plaintiffs implicitly concede it. *Cf. Strong v. B.P. Expl. & Prod., Inc.*, 440 F.3d 665, 668 (5th Cir. 2006) ("By not contesting Strong's arguments that (1) and (3) are satisfied, B.P. implicitly concedes that those conditions have been met. The sole issue is whether federal maritime law applies of its own force.").

and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area.

43 U.S.C. § 1333(a)(2)(A); *see also id.* § 1331(b) (defining the term "Secretary"). In short, "OCSLA extends federal law to the Outer Continental Shelf and borrows adjacent state law as a gap-filler." *Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prod. Co.*, 448 F.3d 760, 772 (5th Cir.), *amended on reh'g*, 453 F.3d 652 (5th Cir. 2006). In this case, "Louisiana is considered the state adjacent to the MAD DOG platform." *Wolz v. BP Expl. & Prod., Inc.*, No. 13-5112, 2015 WL 845958, at *3 n.1 (E.D. La. Feb. 25, 2015) (Barbier, J.).

However, the fact that a case *arises under* OCSLA, *see* 43 U.S.C. § 1349(b)(1), does *not* mean that it is *governed by* OCSLA, *see id.* § 1333(a)(2)(A); *see also In re DEEPWATER HORIZON*, 745 F.3d at 164 ("Federal courts may have jurisdiction to adjudicate a dispute under OCSLA, but they must then turn to the OCSLA choice of law provision to ascertain whether state, federal, or maritime law applies to a particular case."). "Because OCSLA does not displace general maritime law, substantive maritime law continues to govern where both OCSLA and general maritime law could apply."[12] *Hufnagel*, 182 F.3d at 350; *see also Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 459 (5th Cir. 1992) ("When an event occurs on an

---

[12] The "operative assumption" undergirding OCSLA is "that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA." *Tallentire*, 477 U.S. at 218.

OCSLA situs but also is governed by maritime law, maritime law controls."), *overruled on other grounds by Grand Isle Shipyard*, 589 F.3d at 778.

In order for adjacent state law to apply as surrogate federal law in a case arising under OCSLA, then, general maritime law "must not apply of its own force." *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990). Moreover, adjacent state law cannot be "inconsistent" with otherwise applicable federal law. *Id.*; *see also Rodrigue*, 395 U.S. at 355-56 (noting that OCSLA, by its terms, "appl[ies] state law only as federal law and then only when not inconsistent with applicable federal law").

## IV.

### A.

The Court must first consider whether general maritime law applies "of its own force"—in other words, whether plaintiffs' tort claims sound in admiralty. *Union Texas Petroleum*, 895 F.2d at 1047. "To give rise to a tort claim in admiralty, an incident must have both a maritime situs and a connection to traditional maritime activity." *Hufnagel*, 182 F.3d at 351; *see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) ("After *Sisson* [*v. Ruby*, 497 U.S. 358 (1990)], then, a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity."); *Barker*, 713 F.3d at 214 (opinion of Clement, J.) (observing that "maritime law applies of its own force" to a claim where "a court could otherwise have admiralty jurisdiction over the claim").

The maritime situs requirement "can be satisfied in two ways: 1) showing that the tort occurred on navigable water, or 2) showing that the injury was caused by a vessel in navigable water." *Scarborough v. Clemco Indus.*, 391 F.3d 660, 663 (5th Cir. 2004) (citing *Grubart*, 513 U.S. at 534), *abrogated on other grounds by Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 420 (2009); *see also Hufnagel*, 182 F.3d at 351 (same).

According to the Supreme Court, the maritime connection requirement "raises two issues." *Grubart*, 513 U.S. at 534.

> A court, first, must 'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.' Second, a court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'

*Id.*[13]

The first prong of the maritime connection requirement concerns an incident's "potential effects," *id.* at 538, not the "particular facts of the incident" nor its "actual effects on maritime commerce," *Sisson v. Ruby*, 497 U.S. 358, 363 (1990) (emphasis removed). In other words, it focuses "not on the specific facts at hand but on whether the 'general features' of the incident [are] 'likely to disrupt commercial activity.'" *Grubart*, 513 U.S. at 538 (quoting *Sisson*, 487 U.S. at 363). This prong "turns . . . on a description of the incident at an intermediate level of possible generality." *Id.*; *see also Petrobras Am., Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 217 (5th Cir.), *order clarified on reh'g*, 829 F.3d 770 (5th Cir. 2016) ("The Supreme Court has cautioned .

---

[13] *Grubart* "rejected" the "multi-factor approach" that the Fifth Circuit has applied "to determine whether there was a substantial relationship to traditional maritime activity." *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1118 (5th Cir. 1995) (en banc).

. . that the type of incident involved must not be defined at too high or too low a level of generality.").

In *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995), the Supreme Court explained this level of generality by reference to its opinion in *Sisson v. Ruby*, 497 U.S. 358 (1990), which described a fire on a pleasure yacht docked at a marina on Lake Michigan as "a fire on a vessel docked at a marina on navigable waters":

> To speak of the incident as 'fire' would have been too general to differentiate cases; at the other extreme, to have described the fire as damaging nothing but pleasure boats and their tie-up facilities would have ignored, among other things, the capacity of pleasure boats to endanger commercial shipping that happened to be nearby. We rejected both extremes [in *Sisson*] and instead asked whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping.

*Grubart*, 513 U.S. at 538-39 (quoting and discussing *Sisson*, 497 U.S. at 363).

As the Court previously noted, the second prong of the maritime connection requirement concerns "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* at 539. In other words, a court must ask "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Id.* at 539-40; *see also id.* at 542 ("The test turns on the comparison of traditional maritime activity to the arguably maritime character of the tortfeasor's activity in a given case.").

Discussing this prong, the *Sisson* Court opined that "[t]he need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial." *Sisson*, 497 U.S. at 367. Thus, the Supreme Court has concluded that the "[n]avigation of boats in navigable waters clearly falls within the substantial relationship," and "storing [boats] at a marina on navigable waters is close enough." *Grubart*, 513 U.S. at 540 (internal citations omitted). However, "in flying an airplane over the water, as in swimming, the relationship is too attenuated." *Id.* (internal citations omitted).

Like the first prong, the second prong turns on a description of "activity giving rise to the incident" at an intermediate level of generality. *Cf. id.* at 540 ("On like reasoning, the 'activity giving rise to the incident' in this suit should be characterized as repair or maintenance work on a navigable waterway performed from a vessel." (internal citation omitted)); *Hufnagel*, 182 F.3d at 352 ("The activity giving rise to Hufnagel's accident may be characterized as the repair and construction of a fixed offshore drilling platform."). Further, courts "need to look only to whether one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor." *Grubart*, 513 U.S. at 541. "The substantial relationship test is satisfied when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." *Id.*

If the Court concludes that the maritime situs requirement or either of the two prongs of the maritime connection requirement are not met, then plaintiffs' claims

are not maritime in nature. *Cf. In re Katrina Canal Breaches Litig.*, 324 Fed. App'x 370, 377-80 (5th Cir. 2009) (per curiam) (assuming, *arguendo*, that the maritime situs requirement and the first prong of the maritime connection requirement were met, but concluding that the second prong of the maritime connection requirement was not met and thus that the prerequisites for the district court's exercise of admiralty jurisdiction were not satisfied).

**B.**

The Court will assume, *arguendo*, that the maritime situs requirement is met. *See id.* at 377 (assuming the same). The Court will also assume, *arguendo*, that at least one of the putative tortfeasors was engaged in a traditional maritime activity at the time of the incident and that the second prong of the maritime connection requirement is thus met. *Cf. id.* (assuming that the first prong of the maritime connection requirement is met). Therefore, the Court is left only with the first prong of the maritime connection requirement.

As the Court previously explained, the first prong requires an assessment, at an "intermediate level of possible generality," of "the general features of the type of incident involved" in this case in order to determine "whether the incident has a potentially disruptive impact on maritime commerce." *Grubart*, 513 U.S. at 534, 538 (internal quotation marks omitted). The BP defendants and plaintiffs both propose

descriptions of the activity giving rise to the incident,[14] but neither they nor Bishop propose descriptions of the incident itself.[15]

After considering the undisputed facts—and recognizing that "there is inevitably some play in the joints in selecting the right level of generality" to describe a given incident, *Grubart*, 513 U.S. at 542—the Court determines that the incident can be fairly and reasonably described at an intermediate level of generality as an injury to a platform worker during a personnel basket transfer between an offshore platform and a vessel in navigable waters. *Cf., e.g., id.* at 539 ("[T]he 'general features' of the incident at issue here may be described as damage by a vessel in navigable water to an underwater structure."); *Sisson*, 497 U.S. at 363 (describing the "general features" of the incident as "a fire on a vessel docked at a marina on navigable waters"); *Petrobras*, 815 F.3d at 217 ("Here, expressed in general terms, a component failed on an underwater structure in an offshore production installation

---

[14] The BP defendants describe the activity as a "personnel basket transfer[ ] between [a] fixed platform[ ] located on the OCS and [a] vessel[ ]." R. Doc. No. 58-1, at 6; *see also* R. Doc. No. 63, at 10. In contrast, plaintiffs describe the activity as "the action of loading and unloading passengers safely from one floating vessel to another." R. Doc. No. 59-1, at 10.

Plaintiff's description of the activity giving rise to the incident is problematic in several respects. To start, the MAD DOG is an offshore platform, not a vessel. Moreover, the description of the activity offered by plaintiffs obscures material details that define the relevant activity, including that the incident arose from a personnel basket transfer between an offshore platform and a vessel in navigable waters. The Court is also unclear as to why plaintiffs describe the "action" as being done "safely," as their case is premised on the allegation that it was not so done.

[15] The Court acknowledges, that, in arguing that the maritime situs requirement is met, plaintiffs describe the incident as "[a]n accident occurring on a vessel." R. Doc. No. 59-1, at 9; *see also* R. Doc. No. 64, at 4. However, such a description is far too general to appropriately differentiate between cases. *Cf. Grubart*, 513 U.S. at 538 (observing that "[t]o speak of the incident [in *Sisson*] as 'fire' would have been too general to differentiate cases").

and caused the structure to fall to the sea floor."); *Scarborough*, 391 F.3d at 665 ("A more reasonable and fair description of the [incident] at issue at an intermediate level of generality would be 'injury to a Jones Act seaman due to the negligence of a non-employer.'"); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir. 1995) (en banc) ("As to the first 'connection' inquiry, the incident can be described in general terms as an injury to a worker while repairing and maintaining a jack-up rig in navigable waters."[16]).

As far as whether this incident, so described, has the potential to disrupt maritime commerce, "the question is 'whether the incident [can] be seen within a class of incidents that pose[ ] more than a fanciful risk' to maritime commerce." *Petrobras*, 815 F.3d at 217 (quoting *Grubart*, 513 U.S. at 538-39). "The proper focus is on [an incident's] potential effects." *Grubart*, 513 U.S. at 538 (internal quotation marks omitted). The Fifth Circuit has observed that "[c]ases from the Supreme Court and this circuit interpret potential disruption of maritime commerce in terms of the incident's effect on the navigability of the waterways." *Petrobras*, 815 F.3d at 217 (citing cases). Cases have also considered an incident's effect on commercial activities. *See id.* (noting that the type of incident at issue "does not have the potential to disrupt maritime commercial or navigational activities on or in the Gulf of Mexico").

---

[16] A jack-up rig qualifies as a "vessel" under general maritime law. *See Vickers v. Chiles Drilling Co.*, 822 F.2d 535, 537 (5th Cir. 1987). Thus, when discussing whether "an injury to a worker while repairing and maintaining a jack-up rig in navigable waters" has the potential to disrupt maritime commerce, the *Coats* Court considered the probable effects on maritime commerce of an injury to a *maintenance* worker *aboard a vessel. See Coats*, 61 F.3d at 1119.

The type of incident at the center of this case—an injury to a platform worker during a personnel basket transfer between an offshore platform and a vessel in navigable waters—does not fall "within a class of incidents that pose[ ] more than a fanciful risk to commercial shipping."[17] *Grubart*, 513 U.S. at 539. "Fixed drilling platforms do not exist for any purpose related to traditional maritime navigation or commerce." *Hufnagel*, 182 F.3d at 351-52. Indeed, they are "not even suggestive of traditional maritime affairs." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 422 (1985). Rather, offshore platforms "exist[ ] solely to obtain minerals from the [OCS]" in the Gulf of Mexico. *Hufnagel*, 182 F.3d at 352. "[E]xploration and development of the [OCS] are not themselves maritime commerce," and "[t]here is nothing inherently maritime about [the] tasks" performed by offshore platform workers. *Herb's Welding*, 470 U.S. at 425 (citing *Rodrigue*, 395 U.S. at 360-61). Moreover, "[t]o the extent that maritime activities [may] surround" personnel basket transfers to and from offshore platforms, "any connection to maritime law is eclipsed by [their] connection to the development of the Outer Continental Shelf."[18] *AmClyde*, 448 F.3d at 771.

---

[17] In arguing that the first prong of the maritime connection requirement is satisfied, plaintiffs focus on the *activity* giving rise to the incident; they do not focus on the *incident* itself, as *Grubart* directs. *See* R. Doc. No. 59-1, at 10. In any event, the Court has rejected their description of the activity. *See supra* note 14. As the Court has rejected the foundation for their argument that the maritime connection requirement's first prong is met, the Court likewise rejects the argument itself.

[18] The involvement of a vessel in the incident does not alter the Court's analysis. *Cf. AmClyde*, 448 F.3d at 765, 775 ("During the 1998 construction of the Petronius compliant tower, a main load line on a crane, which was mounted on the Derrick Barge 50 ('DB-50'), failed. The crane or load line failure caused the deck section that was then suspended . . . to fall into the Gulf of Mexico on the Outer Continental Shelf off the coast of Alabama and Louisiana. . . . The DB-50's involvement in the accident and other elements of maritime activity that precede or surround the compliant

Because the activities performed on offshore platforms by platform workers fall outside the purview of maritime navigational or commercial activities, injuries to platform workers during personnel basket transfers on offshore platforms will not have a potentially disruptive impact on maritime commerce.[19]  *Cf. Solet v. CNG Producing Co.*, 908 F. Supp. 375, 378 (E.D. La. 1995) (Feldman, J.) ("Though conceivable, it is difficult to envision any potential effects to maritime commerce [due to an injury to a platform worker caused during a personnel basket transfer between an offshore platform and a vessel], and certainly no more than would arise from any crane activity near navigable water.").[20]  As a result, plaintiffs' tort claims against

---

tower's construction on the Shelf are insufficient to support either admiralty jurisdiction or the application of substantive maritime law.").

[19] In *Petrobras America, Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211 (5th Cir.), *order clarified on reh'g*, 829 F.3d 770 (5th Cir. 2016), a panel of the Fifth Circuit concluded that the incident at issue was neither "potentially *nor actually* disruptive to navigation and maritime commerce." 815 F.3d at 218 (emphasis added).  However, the Supreme Court has instructed that the first prong of the maritime connection requirement "does not turn on the actual effects on maritime commerce" of an incident.  *Sisson*, 497 U.S. at 363 (emphasis removed).  Regardless, the Court points out that no party has attempted to argue that the incident at the center of this case in fact affected maritime commerce, and the Court discerns no basis on which to conclude that it did.

[20] Judge Barbier relied on Judge Feldman's opinion in *Solet* in an analogous case involving an injury to a platform work that allegedly occurred during a personnel basket transfer between an offshore platform and a vessel.  *See Henson v. Odyssea Vessels, Inc.*, No. 07-613, 2007 WL 3343011, at *2 (E.D. La. Nov. 8, 2007) (Barbier, J.), *modified*, 2008 WL 544184 (E.D. La. Feb. 25, 2008) (Barbier, J.).  While Judge Fallon has criticized *Solet* as overlooking one aspect of the Supreme Court's opinion in *Grubart*, *see Raffray v. Gulf Logistics, LLC*, No. 10-1017, 2010 WL 5055849, at *6 (E.D. La. Dec. 2, 2010) (Fallon, J.), this criticism relates only to the second prong of the maritime connection requirement, which the Court assumes is met in this case.

the BP defendants and Bishop are not maritime in nature, and federal maritime law

does not govern them.[21]

---

[21] In *Menard v. LLOG Exploration Co., LLC*, 259 F. Supp. 3d 475 (E.D. La. 2017) (Vance, J.), a plaintiff was allegedly injured during a personnel basket transfer between an oil exploration platform named the Delta House on the OCS and a vessel on navigable waters designated the M/V ARABIAN. 259 F.3d at 477-78. Judge Vance concluded that federal maritime law applied to the plaintiff's negligence claims related to the incident. *Id.* at 480.

Judge Vance noted that "[t]he parties' [summary judgment] briefs do not answer the choice of law question" and instead "brief the issues under both general maritime and Louisiana law." *Id.* She then pointed out that the plaintiff "testified that he was injured when the personnel basket jerked up while on the deck of the M/V ARABIAN, and not while he was en route or aboard the Delta House." *Id.* According to Judge Vance, "as the evidence indicates that plaintiff was on the M/V ARABIAN when injured, and not on the Delta House, general maritime law applies." *Id.*

In reaching this conclusion, Judge Vance does not appear to have considered whether the case arose under OCSLA. *See id.* She also does not seem to have applied the Supreme Court's test for determining whether a plaintiff's claims are maritime in nature. *See id.* Further, Judge Vance does not acknowledge that she previously applied adjacent state law in an analogous case, *see Newman v. KMJ Servs.*, Inc., No. 04-2518, 2006 WL 3469563, at *1 (E.D. La. Nov. 30, 2006) (Vance, J.), nor does she acknowledge that other sections of this Court have applied adjacent state law in analogous cases, *see, e.g.*, *Solet*, 908 F. Supp. at 377-78.

Instead, Judge Vance appears to have relied on language in the Fifth Circuit's majority opinion in *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (en banc), in which the Fifth Circuit stated that "[t]he law is clear that when a tort occurs on navigable water on the OCS, as opposed to, for example, a stationary platform, and a non-seaman is injured, maritime law applies to the ensuing tort action by that worker against third parties." 589 F.3d at 781. The *Grand Isle* Court did not cite case law in support of this proposition.

Addressing this language—which it labels "dicta"—BP notes that the Fifth Circuit "did not conduct any analysis as to choice of law concerning the underlying tort" in *Grand Isle*. R. Doc. No. 63, at 9. According to BP, "[t]his is because [the] decision focused on whether the contract at issue was maritime in nature." *Id.* "Thus, [*Grand Isle*], which pertains to a contracts test, is not applicable or controlling of the instant tort dispute." *Id.* The Court agrees with BP on this point.

In any event, the Court understands the proposition put forward by the *Grand Isle* Court to refer to cases that do not arise under OCSLA, as OCSLA jurisdiction was the focus of the *Grand Isle* Court's analysis. In this case, the Court has concluded that OCSLA jurisdiction exists.

## C.

No party argues that Louisiana law is inconsistent with federal law.[22] *Union Texas Petroleum*, 895 F.2d at 1047. All parties, then, implicitly concede the point. *Cf. Strong v. B.P. Expl. & Prod., Inc.*, 440 F.3d 665, 668 (5th Cir. 2006) ("By not contesting Strong's arguments that (1) and (3) are satisfied, B.P. implicitly concedes that those conditions have been met. The sole issue is whether federal maritime law applies of its own force."). Therefore, the Court concludes that Louisiana law, adopted as surrogate federal law under OCSLA, governs plaintiffs' tort claims against the BP defendants and Bishop. *Cf., e.g.*, *Newman v. KMJ Servs.*, Inc., No. 04-2518, 2006 WL 3469563, at *1 (E.D. La. Nov. 30, 2006) (Vance, J.) (applying Louisiana law where the plaintiff alleged that "he was injured when he fell from a personnel basket as he was being transferred from an oil platform located on the Outer Continental Shelf off of the coast of Louisiana to an adjacent supply ship"); *Solet*, 908 F. Supp. at 378 (concluding, based on allegations materially indistinguishable from those in the present case, that the plaintiff's claims against the platform owner were "properly governed by OCSLA" and, thus, Louisiana law).

## D.

Finally, the Court points out that the Fifth Circuit—in precedential cases both predating and postdating *Grubart*—has applied adjacent state law in tort cases involving personnel basket transfers between offshore platforms and vessels in the

---

[22] *See* R. Doc. No. 57-1; R. Doc. No. 58-1; R. Doc. No. 59-1; R. Doc. No. 63; R. Doc. No. 64.

Gulf of Mexico.[23]  *See Davis v. Dynamic Offshore Res., L.L.C.*, 865 F.3d 235 (5th Cir. 2017) (applying Louisiana law in a case where a contractor was allegedly injured during a basket transfer between an offshore platform and a vessel); *Zepherin v. Conoco Oil Co.*, 884 F.2d 212 (5th Cir. 1989) (concluding, where a contractor assigned to an "offshore platform which is permanently affixed to the floor of the Gulf of Mexico on the Continental Shelf off the Louisiana coast" was "being transferred [from the platform] to the deck of [a] vessel on a personnel basket" to assist with offloading supplies, and "the vessel allegedly came up on a wave, causing [the contractor] to be pushed into a load of pipe," *id.* at 212-13, that Louisiana's independent contractor defense shielded an offshore platform owner from liability).[24]

"Because Congress has delineated among admiralty, federal law and adjacent state law in OCSLA, the parties may not avoid, whether voluntarily or inadvertently, the statutory choice." *Petrobras*, 815 F.3d at 217.  In other words, the Fifth Circuit has emphatically rejected the ability of parties in a case "to make a 'litigation choice' between maritime and adjacent state law." *Id.*

---

[23] In at least one nonprecedential opinion, the Fifth Circuit appears to have applied general maritime law in a tort action arising from a personnel basket transfer between an offshore platform and a vessel.  *See Bertrand v. Mobil Oil Expl.*, 15 F.3d 180 (5th Cir. 1994).  The Court notes that this case has never been cited by another court.

[24] The *Zepherin* Court did not explicitly identify the law that it applied.  However, in the process of reaching its conclusion with respect to the independent contractor defense, it cited to several earlier Fifth Circuit cases interpreting and applying Louisiana law.  *See Zepherin*, 884 F.2d at 213 (citing, *inter alia*, *Boutwell v. Chevron, U.S.A., Inc.*, 864 F.2d 406 (5th Cir. 1989); *Grammer v. Patterson Services, Inc.*, 860 F.2d 639 (5th Cir. 1988); *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987)).

The upshot is that the Fifth Circuit's application of state law in tort cases involving personnel basket transfers between offshore platforms and vessels signals that the proper law to apply in such cases is adjacent state law—in this case, Louisiana law.

## V.

For the foregoing reasons,

**IT IS ORDERED** that the motions filed by the BP defendants and Bishop are **GRANTED**, and that Louisiana law governs plaintiffs' tort claims against them.

**IT IS FURTHER ORDERED** that plaintiffs' motion is **DENIED**.

New Orleans, Louisiana, April 5, 2018.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**