| | |
|---|---|
| **ROBERT G. HICKS ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **No. 17-2275** |
| **BP EXPLORATION & PRODUCTION, INC. ET AL.** | **SECTION I** |

## ORDER AND REASONS

Robert Hicks ("Hicks") alleges that he was injured during a personnel basket transfer on March 20, 2016 between the MAD DOG, an offshore platform on the Outer Continental Shelf ("OCS") that is owned and operated by BP Exploration and Production Inc. ("BP Exploration"), and the OCSV SIEM STINGRAY ("STINGRAY"), a vessel time chartered by BP Exploration that was being used at the time as living quarters for some of the MAD DOG's workers.[1] Among the defendants that plaintiffs seek to hold accountable for Hicks' alleged injuries are BP Exploration and BP America Production Company ("BP America") (collectively, "the BP defendants").

Before the Court is the BP defendants' motion for summary judgment.[2] The BP defendants contend that plaintiffs' claims against them should not proceed to trial, because (1) "the plaintiff[s] ha[ve] failed to come forward with any evidence that

---

[1] More specifically, "BP had a Master Services Agreement in place with Subsea 7 [US LLC ('Subsea 7')], which essentially served as a time charter agreement for the M/V STINGRAY ('Subsea 7 Agreement'). Subsea 7 itself had time chartered the STINGRAY from Siem Offshore." R. Doc. No. 78-1, at 20.

[2] R. Doc. No. 78. Among the arguments made in their memorandum in support of their motion for summary judgment, the BP defendants contend that Hicks is not a Jones Act seaman. *See id.* at 12. Hicks has confirmed to the Court that he is not arguing that he qualifies for such status. *See* R. Doc. No. 85.

1

any alleged act of negligence by [ ] workers involved in the transfer breached a standard of care or actually caused his injury"; (2) "the claims against BP based on any alleged negligence from the platform should be dismissed on the basis of the independent contractor defense"; and (3) "BP did not breach any duties of a time charterer in regard[s] [to] the [ ] STINGRAY."[3]  Plaintiffs oppose the motion.[4]

## I.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact.  *See* Fed. R. Civ. P. 56.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its initial burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The showing of a genuine issue of material fact is not satisfied by creating "'some metaphysical doubt as to the material facts,' by

---

[3] R. Doc. No. 78-1, at 1-2.
[4] R. Doc. No. 80.

'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* However, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

Moreover, "[a]lthough the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (quoting 11 Moore's Federal Practice–Civil ¶ 56.91 (2017)). "This flexibility allows the court to consider the evidence that would likely be admitted at trial . . . without imposing on parties the time and expense it takes to authenticate everything in the record." *Maurer v. Independence Town*, No. 16-30673, 2017 WL 3866561, at *3 (5th Cir. Sept. 5, 2017).

## II.

After reviewing the parties' submissions and the applicable law, the Court concludes that summary judgment in the BP defendants' favor is not appropriate.

### A.

The first ground for summary judgment raised by the BP defendants is that "the plaintiff[s] ha[ve] failed to come forward with any evidence that any alleged act of negligence by [ ] workers involved in the transfer breached a standard of care or actually caused his injury."[5] The Court previously concluded that Louisiana law governs plaintiffs' non-time charterer claims against BP.[6]

"In an action [under Louisiana law] to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence."[7] *Hanks v. Entergy Corp.*, 944 So. 2d 564, 578 (La. 2006).

> "Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis, which entails five separate elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); 2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injures (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element).[8]

---

[5] R. Doc. No. 78-1, at 1.

[6] R. Doc. No. 91. The opinion did not address the issue of time charterer liability.

[7] "Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not." *Hanks*, 944 So. 2d at 578. "Thus, the plaintiff . . . must produce evidence from which the factfinder can reasonably conclude his injuries, more probably than not, were caused by the negligence of the particular defendant." *Id.*

[8] The Court notes that general maritime law's negligence standard is more or less the same. *See In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991) ("The plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury. Furthermore, the resultant harm must be reasonably foreseeable." (citations omitted)).

*Id.* at 579.

"Duty varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved." *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994) (discussing Louisiana law). That being said, "[t]here is an almost universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another." *Boykin v. Louisiana Transit Co.*, 707 So. 2d 1225, 1231 (La. 1998); *cf. Dupre*, 20 F.3d at 157 ("As a general rule [under Louisiana law], the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm." (internal quotation marks omitted)). "Whether the defendant breached [a] duty and whether that breach was a cause in fact of plaintiff's injuries are factual questions to be determined by the factfinder." *Hanks*, 944 So. 2d at 580.

Having reviewed the materials submitted by the parties in connection with the present motion, the Court concludes that a reasonable jury could find that workers should not have proceeded with Hicks' personnel basket transfer in light of weather conditions, and that the decision to proceed with the transfer was both the cause-in-fact and legal cause of injury to Hicks.[9] Therefore, the Court will deny the BP defendants' request for summary judgment on breach and causation grounds.

**B.**

---

[9] The BP defendants frame their argument around all workers involved in the personnel basket transfer, regardless of individual workers' relationships with the BP defendants.

The next ground for summary judgment raised by the BP defendants is that "the claims against BP based on any alleged negligence from the platform should be dismissed on the basis of the independent contractor defense."[10] The BP defendants contend that platform workers involved in the personnel basket transfer that allegedly injured Hicks—including, *inter alia*, Freddie Greer ("Greer"),[11] the site lifting coordinator—were independent contractors. Based on this contention, the BP defendants argue that Louisiana's independent contractor defense shields them from liability for those workers' actions.

"The distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis." *McLeod v. Moore*, 7 So. 3d 190, 192 (La. Ct. App. 2d Cir. 2009). For an independent contractor relationship to exist between two parties under Louisiana law, the following five factors must be satisfied:

1. There is a valid contract between the parties;

2. The work being done is of an independent nature such that the contractor may employ nonexclusive means in accomplishing it;

3. The contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;

4. There is a specific price for the overall undertaking; and

5. Specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.

---

[10] R. Doc. No. 78-1, at 1.
[11] Greer was contracted through Bishop Lifting Products, Inc. ("Bishop").

*Ledent v. Guar. Nat. Ins. Co.*, 723 So. 2d 531, 537-38 (La. Ct. App. 2d Cir. 1998); *see also Hickman v. S. Pac. Transp. Co.*, 262 So. 2d 385, 390-91 (La. 1972); *Bourquard v. L.O. Ausauma Enterprises, Inc.*, 52 So. 3d 248, 253 (La. Ct. App. 4th Cir. 2010).

As relevant to the present motion, it is well-established that "[a] principal generally is not liable for the offenses committed by an independent contractor while performing its contractual duties." *Ledent*, 723 So. 2d at 537. However, "[t]wo exceptions to this general rule exist: (1) where the work is ultra hazardous; and (2) if the principal reserves the right to supervise or control the work of the independent contractor."[12] *Id.*

In their memorandum in support of its motion for summary judgment, as well as in their reply, the BP defendants do not attempt to establish that the prerequisites for the existence of an independent contractor relationship are satisfied with respect to some or all of the workers involved the personnel basket transfer at the center of

---

[12] Louisiana law, according to the Louisiana Supreme Court, "recognizes that inquiry to determine whether a relationship is that of independent contractor or that of mere servant requires, among other factors, the application of the principal test: the control over the work reserved by the employer." *Hickman*, 262 So. 2d at 391; *see also Ledent*, 723 So. 2d at 537 ("The most important inquiry is whether the principal retained the right to control the work."). "In applying this test, it is not the supervision and control which is actually exercised which is significant; the important question is whether, from the nature of the relationship, the right to do so exists." *Id.* (quoting *Hickman*, 262 So. 2d at 391).

Similarly, under general maritime law, "a principal who hires independent contractors over which he exercises no operational control has no duty to discover and remedy hazards created by its independent contractors." *Wilkins v. P.M.B. Sys. Eng'g, Inc.*, 741 F.2d 795, 800 (5th Cir. 1984); *see also Skinner v. Schlumberger Tech. Corp.*, 655 Fed. App'x 188, 192 (5th Cir. 2016) (relying on *Wilkins*). "Exception to this general rule occurs only where the principal [ ], despite the independent contractor arrangement, actually retained some degree of control over the manner or methods by which the contractor [ ] does his work." *Wilkins*, 741 F.2d at 800.

this case.[13]  Rather, the BP defendants appear to assume that the use of the words "independent contractor" in a contract, accompanied by boilerplate language about "control" and "supervision," is sufficient under Louisiana law to establish the existence of such a relationship.[14]  It is not.[15]  *See, e.g.*, *Hickman*, 262 So. 2d at 390-91 (opining that "[t]he legal relationship between [one party] and [another party] is to be determined from the contract between and from their intentions in establishing and carrying out that relationship as manifested in its performance and the surrounding circumstances" and then explaining the indicators that an independent contractor relationship exists); *Arroyo v. E. Jefferson Gen. Hosp.*, 956 So. 2d 661, 664 (La. Ct. App. 5th Cir. 2007) ("The existence of an independent contractor agreement is not necessarily dispositive of the issue of whether a doctor is an independent contractor, as opposed to an employee of a hospital.  The courts will inquire as to the real nature of the relationship and the degree of control exercised or ability of control by the hospital over the doctor's activities."); *Ledent*, 723 So. 2d at 537-38

---

[13] R. Doc. No. 78-1; R. Doc. No. 83-3.

[14] *See, e.g.*, R. Doc. No. 78-1, at 17 ("Here, the contract between BP and Ensco . . . clearly sets forth that Ensco's relationship to BP is that of an independent contractor."); *id.* at 18 ("Similarly, Bishop Lifting was also an independent contract[or] of BP, as evidenced by the contract in place at the time of the transfer.").

[15] Indeed, even if the Court focused only on those aspects of the independent contractor inquiry that it could reasonably evaluate by reference to a contract alone, the few select pages of the relevant contracts that the BP defendants have submitted to the Court are not sufficient to allow the Court to conduct the necessary evaluation.  *See, e.g.*, R. Doc. No. 78-2, at 34-39 (Drilling Rig Operation and Maintenance Services Contract Between BP Exploration and ENSCO Offshore Company); R. Doc. No. 78-7, at 4-6 (Master Agreement for Provision of Services Between BP Exploration and Bishop).

(articulating the factors that guide a court's determination of whether an independent contractor relationship exists).

The Court concludes that the BP defendants have not established, for purposes of summary judgment, that the platform workers involved in the personnel basket transfer that allegedly injured Hicks were independent contractors. As such, the BP defendants have failed to demonstrate as a threshold matter that the independent contractor defense is even applicable, and summary judgment in the BP defendants' favor based on this defense is unwarranted.[16]

---

[16] In their opposition to the BP defendants' motion for summary judgment, plaintiffs argue that multiple workers involved in the personnel basket transfer, including Greer, qualify as BP's "borrowed employees." *See* R. Doc. No. 80, at 18-23. When doing so, plaintiffs cite the Fifth's Circuit decision in *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969), a maritime personal injury suit.

After reviewing Louisiana case law, it appears that Louisiana's "borrowed employee" doctrine provides a means by which a plaintiff may hold a principal liable for an independent contractor's actions. *See, e.g.*, *Weber v. Canal Indem. Co.*, 81 So. 3d 990, 993 (La. Ct. App. 4th Cir. 2012) (reversing a trial court's grant of summary judgment in favor of a company in part because "there [were] genuine issues of material fact concerning whether [an individual] was a borrowed employee of [the company]" and noting that "a written contract deeming [the individual's formal employer] an independent contractor" of the company was "not determinative of whether a borrowed employee situation exists"); *McLeod*, 7 So. 3d at 192-95 (affirming a trial court's dismissal of the plaintiffs' claims against D & J Construction Company ("D & J") after first determining that the individual who was directly responsible for their alleged injuries was an independent contractor of D & J and then determining that the individual was not a borrowed servant of D & J). "In deciding whether a borrowed employee relationship exists, the following factors are important to consider in making such a determination":

> (1) who has the right of control over the employee beyond the mere suggestion of details or cooperation; (2) who selected the employee; (3) who paid the employee's wages; (4) who had the right to fire the employee; (5) who furnished the tools and the place to perform the work; (6) was the new employment over a considerable length of time; (7) whose work was being done at the time of the accident; (8) was there an agreement between the borrowing and lending employers; (9) did the

## C.

The final ground for summary judgment raised by the BP defendants is that they "did not breach any duties of a time charterer in regard[s] [to] the [ ] STINGRAY."[17] Worded differently, the BP defendants contend that BP Exploration's status as time charterer of the STINGRAY does not provide a viable path for plaintiffs to recover from them.[18]

"[T]he law of th[e] [Fifth] Circuit is clear that 'a time-charterer is not liable [for injuries caused by a vessel's negligence] . . . unless the cause of the harm is within the charterer's traditional sphere of control and responsibility or has been transferred thereto by the clear language of the charter agreement.'" *Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 791 (5th Cir. 1990) (quoting *Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc.*, 830 F.2d 1332, 1343 (5th Cir. 1987)).

---

employee acquiesce in the new work situation; and (10) did the original employer terminate his relationship with or relinquish his control over the employee.

*Id.* at 194. "Control over the worker is the most important of the factors." *Id.* at 195.
Because the Court denies the BP defendants' motion on other grounds, the Court will not further discuss the "borrowed employee" doctrine.

[17] R. Doc. No. 78-1, at 2. "A time charter is defined generally as '[a] charter for a specified period, rather than for a specific task or voyage; a charter under which the shipowner continues to manage and control the vessel, but the charterer designates the ports of call and the cargo carried.'" *Tidewater Inc. v. United States*, 565 F.3d 299, 303 (5th Cir. 2009) (quoting Black's Law Dictionary 229 (7th ed. 1999)) (alteration in original). "As opposed to a voyage charter, which is for one voyage from point A to point B, a time charter is 'an arrangement of some permanency.'" *Id.* (quoting Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty, § 4-14, at 229 (2d ed. 1975)).

[18] The Court notes that the BP defendants' duties as a platform owner and operator differ from their duties as time charterer. *Cf. Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 791 (5th Cir. 1990) ("The relevant inquiry in this case concerns the scope of ODECO's separate duties as the platform owner-employer and as time charterer.").

Under the traditional time-charter agreement, the time charterer directs the vessel's commercial activities. It may designate the cargo to be carried and determine the vessel's routes and destinations. [The Fifth Circuit has] therefore indicated that a time charterer might be liable for choosing an unsafe combination of cargo in the same hold. A time charterer may also be liable for directing the vessel to encounter natural conditions like hurricanes or treacherous seas.

The time charterer's duties are different from the vessel owner's duties. The vessel owner remains responsible for the seaworthiness of the vessel, dangerous conditions on board, navigational errors by the pilot and negligence by the crew, and a reasonably safe means of access for those boarding or leaving the vessel.

*Id.* at 791-92 (internal citations omitted); *see also Kerr-McGee*, 830 F.2d at 1341 (5th Cir. 1987) (explaining the traditional responsibilities of a time charterer).

In this case, neither the BP defendants nor plaintiffs have demonstrated that the time charter agreement at issue placed non-traditional duties on the BP defendants. *Cf. Moore*, 912 F.2d at 791 ("The parties in this case have not demonstrated that their agreement altered the time charterer's traditional duties. We therefore examine ODECO's traditional time-charterer duties."). Moreover, the undisputed "cause of the [alleged] harm"—a personnel basket transfer between the MAD DOG and the STINGRAY—falls outside a time charterer's "traditional sphere of control and responsibility." *Kerr-McGee*, 830 F.2d at 1343; *see Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1216 (5th Cir. 1993) ("(In *Moore* [*v. Phillips Petroleum Co.*, 912 F.2d 789 (5th Cir. 1990)], we explained that the 'traditional time-charterer duties' are limited to the vessel's commercial activities, such as designating the cargo and the routes and destinations, specifically noting that the vessel owner retains responsibility for providing 'a reasonably safe means of access for those boarding or leaving the vessel.'); *cf. Moore*, 912 F.2d at 792 ("As the vessel owner, Co-

Mar was responsible for access to and from its boat. The rope swing is an artificial means of ingress and egress to and from the fixed platform. The responsibility for the hazards it presents falls . . . outside of the traditional duties of a time charterer.").

However, the Court must also consider whether, "under the instant circumstances," the undisputed facts demonstrate that the BP defendants "altered the traditional allocation of duties and assumed control of (and thus responsibility for) the [personnel basket transfer] proceedings" from the STINGRAY. *Forrester*, 11 F.3d at 1216. This inquiry ventures beyond the terms of the time charter agreement itself and examines the actual division of responsibility on the ground—or, more accurately, on the sea.

In this case, and at the time of the alleged incident involving Hicks, the BP defendants had in place a detailed "lifting assurance plan" ("plan") governing personnel basket transfers to and from the MAD DOG.[19] The plan "outline[d] the roles, responsibilities and procedures for ongoing personnel transportation by personnel basket (Billy Pugh X-904) during the Flotel operations in support of the Mad Dog construction activities."[20] More specifically, the plan delineated the responsibilities of various persons, including the STINGRAY's captain, during personnel basket transfers;[21] prescribed a personnel basket transfer training protocol applicable to "all personnel";[22] defined the preparations required to initiate a

---

[19] *See* R. Doc. No. 80-10 (MAD DOG Flotel Personnel Basket Transfer Lifting Assurance Plan).
[20] *Id.* at 4.
[21] *See id.* at 5-7.
[22] *Id.* at 7; *see id.* at 7-8,

personnel basket transfer;[23] and provided a procedure to follow during personnel basket transfers.[24]

According to the plan, the MAD DOG's Offshore Installation Manager ("OIM"), the highest ranking individual on the MAD DOG[25] and a BP employee,[26] had "the overall responsibility [for] the coordination and operation of personnel transfer operations."[27] While the OIM could "delegate some or all of these responsibilities to competent members of his team," he nevertheless retained a duty to "ensure that all such operations [were] carried out in accordance with [the plan] and in accordance with BP policy."[28]

Further, the plan directed the BP defendants' "Regional Lifting Authority or designee" to make recurring site visits "to ensure full compliance with [the] procedure" outlined in the plan. When asked at his deposition whether he would "on his own decide to conduct transfers differently than BP had specified in their plan, unless [he] had gotten BP's approval," the captain of the STINGRAY testified that he would not.[29]

---

[23] *See id.* at 8-9. According to the plan, a separate "lift plan" "set[ ] out" how to accomplish a lift. *Id.* at 8; *see* R. Doc. No. 80-13. This lift plan included, among other things, a step-by-step process to be followed when undertaking a lift. *See id.* at 2.

[24] *See* R. Doc. No. 80-10, at 10-11. The plan provided, in bold, that "[t]he Crane Operator, site lifting coordinator, the [Designated Person in Charge], or the [Client Vessel Representative] will abort the operation if, in his or her opinion, there is any risk to the safety of personnel." *Id.* at 11. The Court points out that the STINGRAY captain is not included in this particular instruction.

[25] *See* R. Doc. No. 80-8, at 26 (deposition of Wayne Gilbert); R. Doc. No. 80-15, at 3 (deposition of Harlan Rost).

[26] *See id.* at 2-3.

[27] R. Doc. No. 80-10, at 5.

[28] *Id.*

[29] R. Doc. No. 80-3, at 21.

Based on the record before it, the Court concludes that genuine disputes of material fact exist concerning whether the BP defendants "usurped the traditional control that is retained by the vessel's crew in a time charter situation." *Forrester*, 11 F.3d at 1217. Therefore, the Court will not grant summary judgment to the BP defendants on time charterer liability.

**III.**

For the foregoing reasons,

**IT IS ORDERED** that the BP defendants' motion is **DENIED**.

New Orleans, Louisiana, April 19, 2018.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**
